IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STEPHANIE M. LOUCAS,　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　: Civil Action No. 09-762-LPS
　　　　　　　　　　　　　　　　　　:
MICHAEL J. ASTRUE,　　　　　　　　:
Commissioner of Social Security,　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:

Gary Linarducci, Esquire of LINARDUCCI & BUTLER, New Castle, Delaware.
Attorney for Plaintiff.

Charles M. Oberly, Esquire, United States Attorney, and Dina White Griffin, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel and Eda Giusti, Esquire, Assistant Regional Counsel, of the SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.

Attorneys for Defendant.

**MEMORANDUM OPINION**

February 22, 2011
Wilmington, Delaware

[signature] Stark, District Judge:

## I. INTRODUCTION

Plaintiff Stephanie M. Loucas ("Loucas") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Loucas and the Commissioner. (D.I. 8, 10) Loucas asks this Court to direct an award of benefits in her favor or, alternatively, to reverse and remand the Commissioner's decision. (D.I. 8) The Commissioner requests that this Court affirm his decision. (D.I. 10) For the reasons set forth below, Loucas' motion will be denied and the Commissioner's motion will be granted. The decision of the Commissioner, dated May 6, 2009, will be affirmed.

## II. BACKGROUND

### A. Procedural History

Loucas protectively filed her claim for DIB on August 9, 2007, alleging disability since November 21, 1991, due to multiple sclerosis. (D.I. 5 ("Transcript" and hereinafter "Tr.") at 9, 98-102, 124) The application was denied initially and on reconsideration. (Tr. at 58-59) Thereafter, Loucas requested a hearing before an administrative law judge (hereinafter "ALJ"). A hearing was held on April 15, 2009. (Tr. at 24-57) The ALJ issued a decision dated May 6, 2009, concluding that Loucas was not disabled and denying benefits. (Tr. at 6-23) Loucas timely requested review of the ALJ's decision by the Appeals Council, and the Appeals Council denied the request for review without substantive explanation. (Tr. 1-3) Thus, the May 6, 2009

decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On October 13, 2009, Loucas filed a complaint seeking judicial review of the ALJ's May 6, 2009 decision. (D.I. 1) On March 8, 2010, Loucas moved for summary judgment. (D.I. 8) In response, the Commissioner filed a cross-motion for summary judgment, as well as a combined opening brief in support of his cross-motion and opposition to Loucas' motion. (D.I. 11) Loucas then filed a reply brief. (D.I. 13) Hence, the cross-motions are ready for the Court's review.

### B.      Factual Background

#### 1.      Loucas' Medical History, Treatment, And Condition

Loucas' insured status expired on December 31, 1996. (Tr. 9) At that time, Loucas was thirty-five years old and defined as a younger individual under 20 C.F.R. § 416.963. (Tr. 21) Loucas has a high school education, a four year college degree, and past relevant work as a computer programmer. (Tr. 21)

In November 1991, Loucas treated with a neurologist, Thomas C. Mueller, M.D., for right periorbital pain, especially with eye movement. (Tr. 204) At that time, Loucas was six weeks post-partum. Dr. Mueller diagnosed Loucas with optic neuritis and possible demyelinating disease and prescribed steroid therapy. (Tr. 205-06) Dr. Mueller further recommended that Loucas undergo an MRI of the brain. (Tr. 206) Loucas' MRI revealed multiple small nodular high signal intensities in the periventricular and deep white matter of the bilateral cerebral hemisphere, suggestive of multiple sclerosis. (Tr. 199)

From November 1991 until May 1995, Loucas treated with Dr. Mueller for probable multiple sclerosis. During this time, Loucas reported fatigue (Tr. 201, 202, 212, 359), body

numbness (Tr. 202, 214), urinary symptoms (Tr. 200, 201, 213, 217), dizziness and vertigo (Tr. 201), and optic neuritis (Tr. 200-03). Dr. Mueller attributed Loucas' fatigue to caring for her infant and noted waxing and waning of her optical symptoms depending on her fatigue. (Tr. 201-02) EMG and nerve conduction studies performed on Loucas in April 1992 were normal with no electrodiagnostic evidence of peripheral neuropathy. (Tr. 210) Approximately one year later, in March 1993, Dr. Mueller reported that Loucas' neurologic exam "actually is quite good." (Tr. 213) By July 1993, he believed that Loucas had experienced an exacerbation of multiple sclerosis, but found that the manifestations were "quite mild" and curiously hard to demonstrate on examination. (Tr. 214)

In November 1993, Loucas visited Luanne K. Chubb, O.D., an optometrist, for a yearly eye exam. At that time, Loucas' vision was 20/20 bilaterally with correction. (Tr. 216) Consistent with these findings, Dr. Mueller opined that Loucas' decreased right eye vision was nearly completely resolved when she wore corrective lenses, although Loucas reported wearing them infrequently. Dr. Mueller opined that Loucas was "doing well" overall. (Tr. 217)

Loucas did not return to Dr. Mueller until May 1995. At that time, Loucas was pregnant with her second child, and had previously miscarried. (Tr. 218) Dr. Mueller reported that Loucas had no new focal neurologic symptoms and found that she was doing "quite well." (Tr. 218) He asked Loucas to return in one year.

From 1992 through 1998, Loucas also treated with Robert H. Hall, M.D., for homeopathic treatment of fatigue and multiple sclerosis. (Tr. 181-198) In a letter to Loucas' insurer dated January 1994, Dr. Hall stated that Loucas' MS was in remission and that she showed improvement with treatment. (Tr. 188)

3

Two years after her insured status expired, Loucas returned to Dr. Mueller, whom she had not seen since 1995. (Tr. 219) Dr. Meuller stated that since her last visit in May 1995, Loucas "has had no other significant neurological problems to detailed questioning, except for very occasional episodes of some mild fatigue and a few times when she has sensed 'leg heaviness.'" (Tr. 220)

A 1998 MRI of Loucas' brain showed small scattered areas of periventricular white matter changes suggestive of multiple sclerosis. (Tr. 180) Dr. Mueller described the number and severity of the white matter lesions as "relatively mild." (Tr. 224)

In January 1999, Dr. Mueller discussed with Loucas prophylactic therapy for multiple sclerosis, but Loucas was not interested. Dr. Mueller stated that "it is hard to argue with this approach given that she has done very well with multiple sclerosis since 1991." (Tr. 225)

Loucas did not return to Dr. Mueller until September 2000. At that time, she was pregnant with her third child. (Tr. 227) Dr. Mueller noted that Loucas had no major focal neurological symptoms, although she had waxing and waning leg weakness, usually subtle and occasionally visible. (Tr. 227) Dr. Mueller further noted that "[t]his did not decrease her usual activities and never really disabled her." (Tr. 227) Dr. Mueller again encouraged Loucas to consider prophylactic therapy to assist her in the long term, but also "acknowledged that her disease has been very mild without any treatment, without definite, significant clinical progression." (Tr. 229)

### 2. Medical Source Opinions

Loucas' medical records were reviewed by two state agency physicians in October 2007 and December 2007. Both state agency physicians opined that, prior to December 31, 1996, her

4

date last insured, Loucas' multiple sclerosis did not rise to the level of a severe impairment. (Tr. 337-43)

In February 2008, Dr. Hall completed a Multiple Sclerosis Residual Functional Capacity Questionnaire, in which he opined that Loucas was disabled since April 27, 1993, and had a poor prognosis. He noted that Loucas must use a walker or wheelchair for mobility and opined that she could only sit for fifteen minutes at a time and stand for one minute at a time. He further opined that she is incapable of working an eight hour day. (Tr. 347-55)

Dr. Mueller also completed a Multiple Sclerosis Residual Functional Capacity Questionnaire, in which he opined that Plaintiff was completely disabled since 1995-1996, and had a poor prognosis. (Tr. 362-67) Dr. Mueller left several questions uncompleted on this form, but he opined that Loucas could sit for forty-five minutes at a time and stand for ten minutes at a time.

In an accompanying letter, Dr. Mueller stated that Loucas "has always demonstrated a pattern of under-reporting her symptoms." (Tr. 359) He further acknowledged "the relative paucity of documentation regarding these fatigue symptoms in [his] records" but noted that "this should be placed in the context of a patient who was in denial of her MS for years, as well as a rather stoic personality who endeavored to persevere despite her symptoms." (Tr. 360) He also stated in his letter that "it is my best medical opinion that [Loucas] has had disabling fatigue related to her multiple sclerosis, and that by 1996 [Loucas] was unable to work in any capacity in the competitive marketplace because of this fatigue." (Tr. 360)

### 3. The Administrative Hearing

A hearing was held before the ALJ on April 15, 2009. (Tr. 24-57) Loucas was

5

represented by counsel and testified at the hearing. In addition, a vocational expert testified.

### a. Loucas' testimony

The ALJ focused Loucas' testimony on the relevant time frame, which is from November 1991, the date of her alleged disability onset, through December 1996, her date last insured. (Tr. 34) Loucas testified that during that time frame she suffered from fatigue and bladder issues. (Tr. 34) She also testified to bowel problems that she did not tell her doctors about because she felt they were "private." (Tr. 36) Loucas testified that in the 1995-1996 time range, she could only drive short distances and did not lift her child, but "pulled her to me." (Tr. 37) She testified that she spent her days taking care of her children, and doing very minimal household chores, such as cleaning the toilet one day and the sink the next day, because she could not manage to do both in the same day. (Tr. 42) Loucas testified that she did the laundry and pushed the basket across the floor because she could not lift it. (Tr. 42) She would do the grocery shopping but would park next to the shopping cart return so she could use the shopping cart as a walker. (Tr. 42-43) Estimating her functional abilities, Loucas testified that she could walk up to one or two hours in "broken periods of time," stand for less than one hour, and sit in for less than one hour. (Tr. 40)

### b. Vocational expert's testimony

Following Loucas' testimony, the ALJ consulted a vocational expert ("VE"), Dr. Adena Leviton. (Tr. 51) Dr. Leviton classified Loucas' past relevant work, as performed, as being in the light exertional category. (Tr. 52) The ALJ then asked the vocational expert whether Loucas' past relevant work would be precluded by a hypothetical individual about 30 years old at the age of onset with a college degree and occasional postural limitations, but no climbing

6

ladders, rope, and scaffold, and the need to avoid hazards and temperature extremes involving heat. (Tr. 52) The vocational expert testified that such an individual could perform the past relevant work. (Tr. 52-53)

The ALJ then altered the hypothetical so as to limit the individual to simple, unskilled work. (Tr. 53) The VE identified a number of jobs at both the light and sedentary levels. (Tr. 53) At the light level, the VE identified the following jobs: (1) office helper, with 170,000 jobs nationally and 1000 locally; (2) mail clerk, with 86,000 jobs nationally and 300 locally; and (3) counter clerk, with 61,000 jobs nationally and 2,000 locally. At the sedentary level, the VE identified the following jobs: (1) order clerk food and beverage, with 20,000 jobs nationally and 300 locally; (2) addresser, with 30,000 jobs nationally and 300 locally; and (3) taper for printed circuit boards, with 56,000 jobs nationally and 300 locally. (Tr. 53)

The ALJ then asked the VE to consider the use of a cane. The VE testified that the use of a cane would eliminate the jobs of counter clerk and mail clerk, unless the person used the cart in lieu of the cane. (Tr. 53-54) The VE further indicated that the sedentary jobs identified would not be affected by the use of a cane or the elimination of handling and fingering.[1] (Tr. 54) However, if Loucas' testimony were deemed credible, the VE testified that her limitations would result in a loss of productivity greater than 15 to 20%, and Loucas could not perform any work in the national economy. (Tr. 55)

---

[1]The Court notes that several portions of the transcript are described as "inaudible;" however, the Court has discerned the crux of the applicable testimony from the surrounding context.

7

### 3. The ALJ's Findings

On May 11, 2009, the ALJ issued the following findings:[2]

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 1996.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 21, 1991 through her date last insured of December 31, 1996 (20 C.F.R. 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: multiple sclerosis, detrusor external sphincter dyssynergia, optic neuritis, and headaches (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform simple, unskilled light work as defined in 20 CFR 404.1567(b) except that she could lift 20 pounds occasionally, 10 pounds frequently, stand for 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or stairs, balancing, stooping, crawling, crouching and kneeling but never climbing a ladder, rope or scaffold, avoiding concentrated exposure to extreme heat and hazards.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

7. The claimant was born on February 9, 1961 and was 35 years old, which is defined as a younger individual age 18-49 (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

---

[2]The ALJ's factual findings have been extracted from her decision, which interspersed factual findings and commentary. (Tr. 6-23)

8

supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1560(c) and 404.1566).

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time from November 21, 1991, the alleged onset date, through December 31, 1996, the date last insured (20 C.F.R. 404.1520(g)).

(Tr. 6-23)

## III. LEGAL STANDARDS

### A. Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (internal quotation marks omitted).

### B. Review Of The ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383 (c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of

the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

11

sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

12

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether The ALJ's Decision Is Supported By Substantial Evidence

By her Motion, Loucas contends that the ALJ's decision is not supported by substantial evidence. Specifically, Loucas contends that the ALJ erred (1) in failing to call a medical expert witness, and (2) in failing to give any weight to the opinions of Loucas' treating physicians, Dr. Mueller and Dr. Hall.

Social Security Ruling ("SSR") 83-20, 1983 WL 31249, at *3, provides instruction as to the criteria an ALJ must consider in determining disability onset date. In particular, the ALJ must consider the claimant's allegations, the claimant's work history, and medical and other evidence. *Id.* at *2-3. In the case of a slowly progressive impairment, SSR 83-20 acknowledges that "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Id.* at *2. This difficulty is particularly acute where the date last

13

worked by the claimant is "far in the past and adequate medical records are not available." *Id.* When the disability onset date can be inferred from the medical evidence, the ALJ's determination as to how long the disease existed at a disabling level of severity "depends on an informed judgment of the facts" and must have a "legitimate medical basis." *Id.* at *3. In interpreting SSR 83-20, the Third Circuit has concluded that the ALJ should call a medical advisor in circumstances in which the impairment at issue is slowly progressing and the alleged onset date is so far in the past that obtaining adequate medical records is impossible. *See Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001).

In this case, the Court concludes that the ALJ did not err in failing to call a medical expert witness. Although Loucas has been diagnosed with a slowly progressing disease and her alleged onset date is remote in time, the Court concludes that the medical evidence in the record is not inadequate for purposes of determining whether Loucas was disabled as of December 31, 1996, her date last insured.[3] Between November 1991 and December 31, 1996, Loucas treated with both Dr. Mueller and Dr. Hall. Both treating doctors prepared medical records, which are available and in the Court's record. These records show that both treating doctors noted Loucas' symptoms, but neither concluded, during the relevant time, that these symptoms had a serious or disabling impact on Loucas' functional abilities.

---

[3] *See e.g., Thelosen v. Commissioner of Social Security*, 2010 WL 2473848, *5 (3d Cir. June 17, 2010); *Klangwald v. Commissioner of Social Security*, 269 Fed. Appx. 202, 205 (3d Cir. 2008) (noting that SSR 83-20 has generally been applied "only where medical evidence from the relevant period is unavailable" and concluding that the medical records before the ALJ were adequate to support the conclusion that the claimant was not disabled); *Ortega v. Commissioner of Social Security*, 232 Fed. Appx. 194, 198 (3d Cir. 2007) (holding that ALJ was not required to call a medical expert when the claimant's medical records were sufficiently clear to determine disability onset date).

14

Throughout his treatment of Loucas, Dr. Mueller consistently opined that Loucas was "doing well" and her manifestations of multiple sclerosis were "quite mild." (Tr. 213, 218) Although Loucas did not have an appointment with Dr. Mueller between May 1995 and November 1998, Dr. Mueller questioned Loucas extensively when she returned to him in 1998, including regarding her condition during the intervening years. In contemporaneous progress notes, Dr. Mueller stated, "Since I saw her from 1995, she has had no other significant neurologic problems to detailed questioning, except for very occasional episodes of some mild fatigue and a few times when she has sensed 'leg heaviness.'" (Tr. 220) In describing Loucas' May 1998 MRI, Dr. Mueller noted that he did not have a direct comparison to her 1991 MRI, but he still described the findings of the more recent study in isolation as "relatively mild." (Tr. 224) It was not until January 1999 that Dr. Mueller recommend prophylactic therapy for Loucas (which she declined). Referencing Loucas' experience with MS in the past, Dr. Mueller commented on Loucas' disinclination towards such therapy, stating that "it is hard to argue with this approach given that she has done very well with multiple sclerosis since 1991." (Tr. 225) Similarly, in September 2000, nearly four years after her date last insured, when Dr. Mueller summarized Loucas' condition he noted that "[s]he developed a waxing and waning leg weakness, usually subtle, occasionally visible [but] . . . . [t]his did not decrease her usual activities and never really disabled her." (Tr. 227) Dr. Mueller repeated his previous views that Loucas' "disease has been very mild without any treatment, without definite, significant clinical progression." (Tr. 228-29)

Dr. Hall's treatment notes are not inconsistent with Dr. Mueller's observations. In January 1994, when Dr. Hall wrote to Loucas' insurance company requesting continued authorization for her treatment, he stated that Loucas' multiple sclerosis "is in remission." (Tr.

15

188) Dr. Hall noted Loucas' complaints of fatigue and low energy at various times throughout his treatment, but his contemporaneous notes do not support a conclusion that her fatigue was so severe as to impair her functional ability to perform any work.

Loucas contends that the ALJ improperly ignored the February 2008 opinion of Dr. Hall that Loucas was disabled as of April 1993, and the March 2009 opinion of Dr. Mueller that Loucas was disabled sometime in 1995 or 1996. Although a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive. The A.L.J. must review all the evidence and may discount the opinions of treating physicians if they are not supported by the medical evidence, provided that the A.L.J. adequately explains his or her reasons for rejecting the opinions. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

In this case, the ALJ assigned "little weight" to the opinions of Dr. Mueller and Dr. Hall, finding them to be inconsistent with their contemporaneous treatment records for Loucas. The Court finds no error in the ALJ's analysis as it pertains to these opinions. Throughout his treatment of Loucas, Dr. Mueller described her condition as mild, and, as noted above, he applied this characterization to a retrospective view of her condition in 1999 and 2000. His opinions at that time that her disease was mild and not disabling stand in striking contrast to his 2009 opinion, which is essentially unsupported by his contemporaneous treatment notes, as the ALJ observed.

Similarly, Dr. Hall's opinion of total disability as of 1993 not only conflicts with Dr. Mueller's contemporaneous treatment notes, but is also inconsistent with his own treatment notes

from that same time frame, including Dr. Hall's 1994 statement to Loucas' insurance company that her multiple sclerosis was in remission. The ALJ noted this inconsistency in affording little weight to Dr. Hall's opinion.

In sum, the Court concludes that the ALJ provided adequate explanation for her decision to afford little weight to the opinions of Loucas' treating physicians. Their opinions are essentially inconsistent with and unsupported by their contemporaneous treatment notes and the diagnostic tests performed on Loucas, both of which provide substantial evidence supporting the ALJ's determination that Loucas was not disabled during the relevant time frame.[4] Because adequate evidentiary support exists for the ALJ's decision, the Court further concludes that the ALJ did not err in failing to seek the advice of a medical expert. Accordingly, the Court will affirm the decision of the Commissioner denying Loucas' claim for DIB.

## V. CONCLUSION

For the reasons discussed, the Court will deny Loucas' Motion For Summary Judgment and grant the Commissioner's Motion For Summary Judgment. The decision of the Commissioner dated May 6, 2009, will be affirmed.

An appropriate Order will be entered.

---

[4] Loucas makes much of the ALJ's statement that Dr. Mueller's 2009 opinion was "derivative" in nature and contends that this is an improper basis for rejecting the opinion of a treating physician. (Tr. 20) However, the ALJ did not reject Dr. Mueller's opinion outright, as Loucas suggests, but, instead, afforded it "little weight." The ALJ based this conclusion on, among other things, her finding that Dr. Mueller's contemporaneous treatment notes were inconsistent with his 2009 opinion.